CASE NO. 13-3280

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

_____

JOSEPH COLES,
Appellant,


-vs-


KEITH SMITH,
Appellee.

_____

On Appeal From the United States District Court
for the Northern District of Ohio,
Case No. 1:10-cv-000525

_____

**BRIEF OF THE APPELLANT**

_____


Erika B. Cunliffe, 0074480
Assistant Public Defender
Cuyahoga County Public Defender
310 Lakeside Avenue, Suite 200
Cleveland, Ohio 44113
(216) 443-7580
Peachliffe1@yahoo.com
Counsel for Petitioner-Appellant

## DISCLOSURE OF CORPORATE AFFILIATIONS

Pursuant to Rule 26.1 of the Sixth Circuit Rules, Petitioner-Appellant, Joseph Coles, makes the following disclosure:

1. Is said party a subsidiary or affiliate of any publicly-owned corporation not named in this appeal?  **NO.**

2. Is there a publicly-owned corporation, not a party to the appeal, that has a financial interest in the outcome?  **NO.**

UNITED STATES COURT OF APPEALS, SIXTH CIRCUIT
FACT SHEET FOR STATE HABEAS CORPUS APPEALS (§2254)

Case Name and Number: <u>Joseph Coles, Appeal No. 13-3280</u>

Person Reporting: <u>Erika B. Cunliffe</u>

1. Has this conviction(s) been previously litigated in the United States Courts?

        ( **x** ) Yes       ( ) No

        If yes, give brief history: <u>Appellant's Petition for Writ of Habeas Corpus was filed with the U.S. District Court for the Northern District of Ohio. That Petition was denied on its merits, which forms the basis of this appeal. The district court granted a certificate of appealability on two of Coles' claims.</u>

2. Constitutional violation claims (name constitutional provision and briefly recite facts asserted as violative):

        The instrument with which the State of Ohio charged Appellant, made up of hundreds of identical counts alleging repeated instances of misconduct over two three-year time periods violated Fifth, Sixth and Fourteenth Amendment rights to due process, notice, and a fair trial, while further failing to prevent double jeopardy violations.

        Improper closing arguments by the trial prosecutor, vouching for the complainant and inappropriately maligning Appellant's character and credibility, violated Appellant's rights to due process and a fair trial in violation of the Fifth, Sixth and Fourteenth Amendments.

3. Have remedies been exhausted as to claims listed above?

        ( **x** ) Yes       ( ) No

4. Are there fact disputes concerning claims?

( **x** ) Yes          (  ) No

5. Does the state argue that any constitutional violations, if found, were harmless beyond reasonable doubt?

( **x** ) Yes          (  ) No

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................... iii

TABLE OF AUTHORITIES..............................................................iv

STATEMENT IN SUPPORT OF ORAL ARGUMENT ...................................1

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION ..........................................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ..................................3

STATEMENT OF THE CASE ..........................................................3

STATEMENT OF THE FACTS ........................................................7

SUMMARY OF THE ARGUMENT ..................................................16

STANDARD OF REVIEW.............................................................19

ARGUMENT....................................................................................21

    I. When the State's charging instrument alleges numerous identical offenses occurring over an extended period of time it violates the accused's right to notice, due process and a fair trial while failing to protect against double jeopardy .........................................................21

    II. The Prosecutor's improper closing arguments bolstering the complainant's account while unjustifiably impugning Coles violated his rights to Due Process and a Fair Trial .................................................30

CONCLUSION.....................................................................................37

CERTIFICATE OF SERVICE .......................................................38

CERTIFICATE OF COMPLIANCE ................................................................38

DESIGNATION OF CONTENTS OF APPENDIX ......................................39

# TABLE OF AUTHORITIES

## CASES                                                                                    PAGE

*Berger v. United States,*
295 U.S. 78, 88 (1935)...................................................................................31

*Berry v. Palmer,*
518 F. App'x 336, 343, 2013 WL 1188985 (6th Cir. 2013) ...............................25

*Cole v. Arkansas,*
333 U.S. 196, 201 (1948)...............................................................................21

*Darden v. Wainwright,*
477 U.S. 168 (1986)........................................................................................19

*Doe v. Charleston Area Med. Ctr.,*
529 F.2d 638 (4th Cir.1975)...........................................................................29

*Eberhardt v. Bordenkircher,*
605 F.2d 275 (6th Cir. 1979) ..........................................................................31

*FDIC v. Abraham,*
137 F.3d 264 (5th Cir.1998)...........................................................................29

*Hughes v. Carlton,*
2005 WL 3338726, Case No. 3:05–0120 (M.D.Tenn. Dec. 8, 2005)................21

*Hutto v. Davis,*
454 U.S. 370 (1982)........................................................................................29

*In re Penn Central Transp. Co.,*
553 F.2d 12 (3d Cir.1977)...............................................................................29

*Joseph v. Coyle,*
469 F.3d 441 (6th Cir. 2006) ..........................................................................19

*Lambert v. Warden,*
2003 WL 22071466 (6th Cir. 2003) ................................................................30

*Martin v. Parker,*
11 F.3d 613 (6th Cir. 1993) ...........................................................................36

*Maurer v. Minnesota Dept. of Corrections,*
32 F.3d 1286 (8th Cir. 1994) ..........................................................................32

*Mooney v. Holohan,*
294 U.S. 103 (1935) ........................................................................................31

*Ohio v. Coles,*
2008 Ohio 5129, 2008 WL 4436872 ..............................................................26

*Pinchon v. Myers,*
615 F.3d 631 (6th Cir. 2010) ..........................................................................19

*Ruimveld v. Birkett,*
404 F.3d 1006 (6th Cir. 2005) ........................................................................19

*Russell v. United States,*
369 U.S. 749 (1962) ........................................................................................28

*State v. Brand* (1978), 56 Ohio App.2d 271 ..................................................32

*Taylor v. Withrow,*
288 F.3d 846 (6th Cir. 2002) ..........................................................................19

*United States v. Carroll,*
26 F.3d 1380 (1994) ........................................................................................34

*United States v. Hogan,*
986 F.2d 1364 (11th Cir. 1993) ......................................................................29

*United States v. Humphrey,*
287 F.3d 422 (6th Cir. 2001) ..........................................................................29

*United States v. Odom*,
252 F.3d 1289 (11th Cir. 2001). ..........................................................21

*United States v. Olivares-Vega*,
495 F.2d 827 (2d Cir. 1974). ..............................................................29

*United States v. Simmons*,
96 U.S. 360 (1877) .............................................................................21

*Valentine v. Konteh*,
395 F.3d 626 (6th Cir. 2005) ............................................... 17, 26, 29

*Washington v. Hofbauer*,
228 F.3d 689 (6th Cir. 2000) ..............................................................36

*Yanai v. Girts*,
501 F.3d 743 (6th Cir. 2008) ..............................................................31

## STATUTES

28 U.S.C § 2254.....................................................................................1

28 U.S.C.§ 1331 .....................................................................................1

## CONSTITUTIONAL AMENDMENTS

Sixth Amendment to the United States Constitution....................passim

Fifth Amendment to the United States Constitution....................passim

Fourteenth Amendment to the United States Constitution............passim

ix

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Appellant requests oral argument in this case, and believes it will provide an opportunity for the parties to convey and clarify for the Court their respective positions with respect to the issues.

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

A.    Subject Matter Jurisdiction in District Court.

Subject matter jurisdiction in the district court was proper under 28 U.S.C. §§ 1331 and 2254. Appellant challenged his Ohio conviction based on federal constitutional principles.

B.    Jurisdiction in this Court.

Appellate jurisdiction in this cause was vested in this court upon the filing of a Notice of Appeal by the Petitioner-Appellant Coles on March 9, 2013 (R. 20, Notice of Appeal, Page ID. #2258), from the Order and Opinion entered by the district court on February 7, 2013, (R. 18, Order, Page ID. # 2235), dismissing Coles' petition.

While dismissing the petition, the district court, nevertheless, granted Coles a certificate of appealability with respect to two of his claims. Specifically, the court noted observed that –

> [R]easonable jurists might disagree as to the propriety of the notice Petitioner received and the effect of the prosecutor's comments on the fairness of Petitioner's trial, in light of the fact that the improper comments concerned the witness that provided the evidence of rape. Consequently, the court grants Petitioner's request that the court issue a certificate of appealability as it relates to grounds one and four and certifies these grounds for appeal.

(R. 18, Page ID # 2256)

This appeal is from a judgment disposing of all claims with respect to the parties, and is taken as of right. Title 28 U.S.C. §§ 1291 and 2253.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

Whether Coles was denied his constitutionally guaranteed rights to due process, notice and the prohibition against double jeopardy where the instrument the State used to charge him involved numerous identical counts alleging undifferentiated misconduct over extended periods of time.

Whether the trial prosecutor violated Coles' rights to due process and a fair trial by employing improper remarks – repeatedly vouching for the complainant's credibility; and leveling inappropriate attacks on Coles' credibility and character – during his closing arguments to the jury.

## STATEMENT OF THE CASE

The State of Ohio initiated this prosecution with an indictment alleging 242 charges against Mr. Coles. Those charges stemmed from allegations that Coles engaged in sexual misconduct with his stepdaughter, S.D. over more than six years before and after her 13th birthday.  The indictment focused on two time periods.  111 Counts alleged misconduct between 1/8/1998 – 1/7/2001 as follows:

| | | |
|---|---|---|
| Kidnapping – Counts 1 – 37 | 37 separate incidents |
| Rape - | Counts 38 – 74 | 36 separate incidents |
| GSI - | Counts 75 – 111 | 36 separate incidents |

134 Counts alleged misconduct between 1/8/2001 – 7/5/2004 as follows:

| | | |
|---|---|---|
| Kidnapping – | Counts 112 – 154 | 42 separate incidents |
| Rape - | Counts 155 – 197 | 42 separate incidents |
| GSI - | Counts 198 – 240 | 42 separate incidents. |

After the prosecution introduced its case-in-chief, it dismissed a total of 37

counts – specifically *nolle prossing* counts 24-37, 63-74 and 99-111.

The prosecution also amended the indictment to narrow the time

periods during which the complainant maintained some of the incidents

occurred.  The amended indictment alleged that Cole had committed 24

counts each of Kidnapping, Rape and GSI before S.D. turned 13.  The State

maintained that the incidents alleged originally as counts 1-2, 38-39, and 75-

76 occurred sometime in July of 1998.  Those events alleged in counts 3-23,

40-61, and 77- 98 occurred between June and November of 2000. (R. 7-25,

Page ID. # 1575-1576)

The remaining 202 counts were renumbered sequentially and

submitted to the jury.  The jury then retired to deliberate. The next

morning, the court received a note from some of the jurors, claiming that

they felt intimidated by Mr. Coles' family who had observed the

proceedings and were in the courthouse lobby when the jurors left for the

4

day. (R. 7-22, Page ID # 801-4) According to the note the court read into the record, the family made some of the jurors "feel uncomfortable... and that they feel that it's deliberate and malicious."  (R. 7-22, Page ID # 801) Although these sentiments appear to have been held by only one juror, the trial court made extensive findings in front of the jury – during their deliberations – that Mr. Coles' family was, indeed, attempting to intimidate them. (R. 7-22, Page ID # 810)

Nevertheless, after the jurors were questioned concerning whether, notwithstanding the claimed intimidation, they could deliberate fairly, the court directed them to continue deliberating.  (R. 7-22, Page ID # 817-18) That afternoon, however, Juror Number 2, the one who claimed to have been intimidated by the conduct of Mr. Coles' family, became hysterical in front of the other jurors.  After an *ex parte* communication with the judge's bailiff, that juror went to lunch.  (R. 7-26, Page ID # 1864-66, 1869-70) The court later excused the juror, replaced her with an alternate, and instructed the reconstituted jury to begin its deliberations anew.  (R. 7-26, Page ID # 1873-77) The court, however, never ascertained the source of the excused juror's emotional disturbance or the impact her outburst might have had on this jury.

The next day, the jury issued its verdict, acquitting Mr. Coles on the first 115 counts. Those counts involved conduct from the abuse incidents alleged before S.D. was 13th birthday and all the kidnapping charges from both time periods. The jury also acquitted Mr. Coles of the child endangering counts alleged in counts 201 and 202. The jury convicted Coles on the remaining GSI and Rape charged purportedly stemming from 42 incidents alleged in counts 115 through 200.[1] (R. 7-25, Page ID#1880-1890) The court merged the GSI counts into the rape counts and imposed consecutive five-year terms on each count – for an aggregate prison sentence of 210 years.

On appeal, the Eighth District Court of Appeals found that there was insufficient evidence to sustain the GSI counts, and vacated them. Nevertheless, the court allowed Mr. Coles' convictions and 210 year prison sentence on the rape counts to stand. It also rejected, among numerous other issues, Mr. Coles' contention that the charging instrument used in this case, charging hundreds of identical undifferentiated sexual misconduct

---

[1] There was a 43rd rape count. When it instructed the jury in this case, however, the trial court told it that there were only 42 rape counts. (R. 7-26, Page ID # 1822) As a consequence when it reached its verdict, the jury left the 43rd rape count (renumbered Count 134) unaccounted for.

allegations, violated his rights to notice, and a fair trial, as well as the prohibition against double jeopardy. The court also rejected Mr. Coles' prosecutorial misconduct claim. *Ohio v. Coles*, 2008 Ohio 5129, 2008 WL 4436872. Mr. Coles sought leave to appeal in the Ohio Supreme Court, which refused to take jurisdiction over the matter. *Ohio v. Coles*, 121 Ohio St.3d 1426, 2009 Ohio 129.

Coles filed a petition for habeas corpus relief in this Court on March 11, 2010. (R. 1) The magistrate judge recommended that the District Court partially grant Coles' request for relief with respect to his challenge to the sufficiency and clarity of the indictment alleged in Ground One, but rejected the balance of his claims. (R. 14, Page ID # 2043) The parties both submitted objections to the Report and Recommendation. The district court decision rejecting the magistrate judge's conclusions, dismissing the petition, and entering final judgment in the Warden's favor was issued on February 7, 2013. (R. 18, Page ID # 2235)

<u>STATEMENT OF THE FACTS</u>

The prosecution's primary trial witness was S.D. S.D. was 18 years old when this case was tried. She testified that she was born on January 8, 1988. Her parents divorced when she was little, and her mother, Dawn,

started seeing Joseph Coles when she was five or six years old. Initially, Mr. Coles stayed at their house only occasionally. She said that she did not get along with him very well, but acknowledged that she referred to him as her "dad."  Coles and her mother eventually married. Her half-sister, Tianna Coles, and half-brother, Joseph Coles, are children of that union. (R. 7-23, Page ID #1042-46)

<u>S.D.'s account of misconduct prior to her 13th birthday</u>

When S.D. was 10 years old, she and her mother lived in Lakewood, Ohio and she attended Franklin Elementary School. According to her testimony, during the summer between fourth and fifth grade year, Mr. Coles began sexually abusing her. (R. 7-23, Page ID #1047-50) S.D. recalled that one night she and Mr. Coles were in the living room watching a television program called *Living Single*.  Coles asked her to change into a t-shirt and panties. When she returned, Coles made her lie down on the floor, and then put his finger into her vagina.  It hurt, so she pushed him away.  Next Coles had her hold his penis until he ejaculated. She washed her hands and went to bed. When she woke up the next morning, he was touching her vagina. She told him to get away. (R. 7-23, Page ID # 1050-56)

When, one week later, S.D. told her mother about the incident, her

8

mother ordered Coles to leave. S.D. went to stay with grandparents for the rest of the summer. S.D. also told a social worker about the abuse. (R. 7-23, Page ID #1056) The following year Mr. Coles would visit the Lakewood house when he babysat his son.  S.D.'s mother, however, never left S.D. alone with Coles.  In March, Mr. Coles and her mother got into an argument. After Coles hit her mother, the police were called, and Coles was taken to jail. (R. 7-23, Page ID #1058)

During the summer between S.D.'s sixth and seventh grade years, her mother and Coles got back together. Nothing had happened since the first incident, but S.D. testified that the abuse started up again that summer, when she was 12 years old. (R. 7-23, Page ID # 1060-63)

S.D. offered little detail about the first incident, except to say that Mr. Coles put his penis in her vagina. She also testified that this sexual contact with Coles would occur weekly or once every couple of weeks. Coles threatened to hurt her, so she did not tell anyone about it. She also did not tell anyone, because she thought no one believed her the first time (which is curious, given that DCFS became involved in the case and her mother threw Coles out of the house after S.D. reported the incident, and took additional steps to protect S.D. in the wake of that report). (R. 7-23,

9

Page ID # 1063-65)

During the S.D. was 12, she became pregnant. She told her mother that the father was a boy in her school who moved to Florida or California. S.D. testified that she told Mr. Coles that she was pregnant, and he told her to blame someone else. S.D. had an abortion, which was done improperly and almost caused her to bleed to death. Mr. Coles took care of her, while she was recovering (R. 7-23, Page ID # 1065-71)

<u>S.D.'s testimony regarding misconduct after her 13th birthday</u>

In June between seventh and eighth grade the family moved to a different Lakewood address. S.D. was 13 years old at this point and attending Harding Middle School. S.D. testified that Coles continued to abuse her.  S.D.'s account was, again, short on details. She did recall that the abuse would typically take place either in the living room or her mother's room. She said, Mr. Coles would wake her up and put his penis in her vagina. She said it happened "a lot," probably twice a week. (R. 7-23, Page ID #1072-75)

By June of 2002, Coles had moved in with them, and family, which had grown, moved to a new location in Parma. S.D. testified that Mr. Coles also abused her there. She testified that Mr. Coles would have sex

with her in the finished basement, her parents' room or her room. Most of the incidents happened when her mother was at work. She said it happened almost every day. S.D. started taking birth control pills. Her mother got her the prescription after Mr. Coles allegedly told her mother she should be taking the pill, because she was a teenager (R. 7-23, Page ID # 1076-78)

S.D. stopped taking the pill because she thought it was disrupting her body chemistry.  In January of 2004, S.D. became pregnant again. She was in the tenth grade. She told her mother that a school friend had gotten her pregnant.  She had another abortion. (R. 7-23, Page ID # 1076-86) S.D. recalled that between March of 2004 and July of 2004, Coles abused her approximately twice a week. The family moved to Iowa in July of 2004, because her mother got a new job. S.D. testified that the abuse continued in Iowa (R. 7-23, Page ID# 1086-91).

In June of 2005, S.D. told her mother that Mr. Coles had been abusing her. S.D. had just had an argument with Mr. Coles over her excessive use of a cell phone. S.D. claimed that Coles had asked her for sex and she had finally refused. Her mother arranged for S.D. to return to Ohio, and S.D. moved in with an aunt in Ravenna. (R. 7-23, Page ID# 1092-97)

11

S.D. subsequently signed an affidavit recanting her accusations against Mr. Coles. (R. 7-24, Page ID# 1107) At trial, however, she repudiated the recantation, explaining her motive for signing it this way: Her aunt had kicked her out of the Ravanna house, and she had been staying with a friend in a Cleveland crack house. She called Joseph Coles' mother, Jeanne Woodson, who she thought of as a grandmother, asking for help.  According to S.D., Ms. Woodson told her the only way she would help was if S.D. signed a statement recanting her accusations. When S.D. refused, Ms. Woodson returned to and abandoned her at the crack house. (R. 7-24, Page ID# 1107-9) The next day S.D. agreed to make the statement recanting the accusations, which Ms. Woodson had notarized at a bank. At trial, S.D. claimed she only made the statement was because she had no place to stay, and she was worried that her mother would lose custody of brother and sister. (R. 7-24, Page ID# 1109-10)

Scant evidence corroborating S.D.'s account

The prosecution did call other witnesses, but beyond some confirmation that S.D. had accused Mr. Coles of abuse in 1998, none of them provided specific support for S.D.'s allegations that any other incidents of abuse were perpetrated by Mr. Coles during the indicted

12

timeframes. One witness testified that the family had been investigated after S.D. claimed Mr. Coles had abused her in June of 2000.  Although the department of social services did become involved with the family at that time, no criminal action was taken. (R. 7-24, Page ID#s 1170-76; 1264-69; 1271-81; 1293-96)

Another witness confirmed that S.D. had undergone an abortion. (R. 7-24, Page ID# 1187-95; 1254-58) Nevertheless, witnesses testified that S.D. had told them that the father was a 13-year old boy who had left town, not Mr. Coles, as S.D. insisted at trial. (R. 7-24, Page ID# 1313-1331).

S.D.'s maternal aunt, the one with whom S.D. stayed when she returned from Iowa, testified that S.D. lived with her until she went to college. She acknowledged hearing about some kind of abuse incident involving S.D. and Mr. Coles in July of 1998, but never heard about how it was resolved because she left town. S.D. rarely spoke with her aunt about her more recent claims against Mr. Coles. S.D.'s aunt recalled that S.D. was a difficult teenager to live with. On one occasion they had an argument and S.D. did not return for a week. (R. 7-25, Page ID# 1365-76)

Dawn Coles, S.D.'s mother, testified.  Dawn had been charged wit child endangering in connection with S.D.'s allegations and had agreed to

cooperate with the prosecution against Coles in exchange for a reduced penalty. According to Dawn, after S.D. told Dawn about the abuse and moved back to Cleveland, Mr. Coles told Dawn that he and S.D. had been "lovers" but he wanted to break it off. (R. 7-25, Page ID# 1396-1402)

Dawn also testified, however, that S.D. had accused others of rape, and had a propensity to make such accusations when confronted by authority concerning her own misbehavior. For example, in June of 2000, S.D. was late getting home from school. When Ms. Coles confronted her about it, S.D. said a boy had raped her, but begged her mother not to report the incident. Although Dawn was not sure exactly when this happened, she recalled that it was during the last week of school in June of 2000. (R. 7-25, Page ID# 1413-19) According to S.D.'s mother, when S.D. was pregnant the second time, she also told her mother she had been raped - again, while walking home from school. Ms. Coles said she did not believe her daughter and never reported the accusation to the police. (R. 7-25, Page ID# 1420-25)

<u>Defense case opposing S.D.'s allegations</u>

In addition to his own testimony denying S.D.'s claims, Joseph Coles called six witnesses. His daughter, Courtnee Coles, testified that she

14

lived with her biological mother but stayed with her father in the summertime. (R. 7-25, Page ID# 1555-56) She testified that her father has never touched her inappropriately. She also never saw any inappropriate contact between Mr. Coles and S.D. She described the relationship between Mr. Coles and S.D. as normal and close. She said that S.D. referred to Mr. Coles as her "real dad." Courtnee testified that she never heard S.D. accuse Mr. Coles of inappropriate behavior. (R. 7-25, Page ID# 1555-63)

Dominique Simone Coles, Joseph Coles's niece, has known S.D. since 1996. At that time, Dominique lived in Lakewood approximately four blocks from S.D. She saw S.D. every day and, observed interactions between Mr. Coles and S.D. She said that S.D. interacted normally toward Mr. Coles. Dominique testified that Mr. Coles has never touched her inappropriately. She also testified that S.D. never claimed that Mr. Coles was touching her in an inappropriate manner. (R. 7-25, Page ID# 1582-91)

Shalese Patterson, Dominique Coles' half sister also knew S.D. well. The two families were very close and were at each others houses frequently. She had many opportunities to observe the relationship between Mr. Coles and S.D. S.D. did not appear to be afraid of Mr. Coles

and was affectionate toward him. Miss Patterson had spent many nights with the Coles family, and never recalled Mr. Coles behaving in a sexually aggressive or inappropriate way with anyone, including herself or S.D. (R. 7-25, Page ID# 1593-1600)

Antionette Coles, Joseph Coles's sister and Dominique and Shalese's mother, also testified. She has known S.D. since the girl was eight. S.D. came to their house frequently to play with Shalese and Dominique and she went to the Coles house frequently. She said that she never heard any reports of anything inappropriate involving Mr. Coles. Neither of her daughters were afraid of Mr. Coles; and S.D. never indicated any fear or queasiness in her interactions with  Mr. Coles. Antionette testified that she never saw anything which made her suspicious that S.D. was being abused. (R. 7-25, Page ID# 1604-11)

Jean Woodson, Joseph Coles's mother, described S.D. as "manipulative." She said that she never saw anything inappropriate between S.D. and Mr. Coles, nor did S.D. appear to be afraid of Mr. Coles. (R. 7-25, Page ID# 1618-20) Ms. Woodson testified that while S.D. was living with her aunt Jodie in Ravenna, Jodie threw S.D. out because she was disrespectful. Ms. Woodson learned S.D. was living with a friend at

93rd and Cedar Avenue in Cleveland. Ms. Woodson picked up S.D. and brought S.D. to her apartment in Shaker Heights. When S.D. became disrespectful, however, Ms. Woodson took her back to the friend's house and left her there. (R. 7-25, Page ID# 1629-32)

Ms. Woodson testified that she returned S.D. to the apartment on 93rd and Cedar, not because S.D. refused to sign the recantations, but because S.D. was acting badly.  When S.D. called again the next day asking for help, Ms. Woodson cautioned that S.D. must show her, her parents, and her Aunt Jodie respect. (R. 7-25, Page ID# 1633-35) S.D. told Ms Woodson that she wanted to recant her claim that Mr. Coles had raped her. Ms. Woodson denied forcing S.D. to recant or telling her what to say. S.D. wrote out a statement, signed it; and she and Ms. Woodson had the statement notarized. Ms. Woodson insisted that she never threatened to return S.D. the crack house if she didn't recant. (R. 7-25, Page ID# 1635-43)

Joseph Coles categorically denied sexually abusing S.D.  He denied paternity of both babies S.D. had aborted. He denied even knowing that the first abortion had occurred. He also denied ever telling Dawn Coles that he and S.D. were lovers. (R. 7-25, Page ID# 1657-61)

17

## SUMMARY OF THE ARGUMENT

Issue I

While the State has an important interest in prosecuting child sexual assault cases, it must do it in a manner that is consistent with a defendant's constitutional rights.  Such an interest is not legitimately furthered when the prosecution uses a charging instrument that is voluminous, vague, and unspecified – then, after trial, alters it to comport with the evidence it introduced.  Notice is a pre – not post – trial concern. Providing the accused with notice of the charges against him after the state has presented its case – after the opportunity for discovery, confrontation and cross-examination have passed – is simply useless.

If any case underscores the need for notice in this context, it is this one.  Mr. Coles went to trial facing 242 counts (the indictment is more than an inch thick) accusing him of approximately 66 different sexual assaults during two timeframes. (R. 18-19, Page ID # 1968-2042) The rape counts were indistinguishable.  Repeated requests for clarification through a more specific bill of particulars proved unavailing.  The complainant testified generally about a pattern of sexual misconduct occurring over a six-year period, beginning when she was 10 years old and ending when she

was 15.  The complainant could only approximate the frequency of the incidents.  Except for the very first incident, no effort was made by the prosecution to tether any of the evidence to the indicted counts.

Mr. Coles has consistently maintained that the charging instrument used violated his right to notice and due process, while creating potential double jeopardy concerns.  In rejecting this challenge, the district court concluded that the complainant's testimony, which approximated as many as 149 incidents of abuse, provided sufficient notice of the 43 rape counts charged in the indictment. (R. 18, Page ID# 2247)

The district court also concluded that this Court's decision in *Valentine v. Konteh*, 395 F.3d 626 (6th Circ. 2005), which ought to have garnered Coles a favorable result, did not apply. The charging instrument at issue in that case was notably similar to the one prosecutors used to charge Coles (except that Coles' indictment was far more voluminous). In *Valentine*, this Court found that a charging instrument alleging multiple indistinguishable counts violated due process, notice and double jeopardy principles.

The district court, however, resolved that the precedent on which this Court relied in *Valentine* was not applicable to Mr. Coles because it

19

was directed at the sufficiency of a federal indictment and the constitution does not require the states to charge by way of an indictment.  Finally, the district court concluded that even if it did apply *Valentine*, it would reject any relief stemming therefrom, because according to the district court, "the record demonstrates there was evidence to support the forty-three separate criminal acts of rape charged."  (R. 18, Page ID # 2247)

The district court is mistaken on all fronts.  There are three – 1) It is clearly wrong and not reasonable to allow prosecutors to fulfill their notice obligations at the end of trial rather than beforehand; 2) It is not reasonable to treat a witness's "guesstimates" about the number of times particular misconduct occurred as evidence, nor is it reasonable to rely on such speculation to provide the defense with notice typically required of a charging document; and 3) district courts are not supposed to reject or refuse to apply their circuit court case law, particularly when it is directly on point. For these reasons, the district court's decision denying Mr. Coles' petition and concluding that the state court's resolution of this case was reasonable should be reversed.

Issue II

The second issue on which the district court granted a certificate of

appealablity concerns the extent to which the prosecutor's improper closing arguments undermined the fairness and integrity of Mr. Cole's trial. During summation, the prosecutor was given unfettered leeway to bolster the complainant's account, while simultaneously impugning Coles' credibility and character. This was a he said/she said type case. In addition to the case's troubling subject matter – incest - it was rife with extraneous drama – abortions, race (Coles' family is black/S.D.'s is white), alleged intimidation, and hysterical jurors. The resulting tumult clearly made its way into deliberations.  In such a case, comments like the ones this prosecutor made were likely devastating, and given this record, impacted the trial's fairness.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's decision to grant or deny a petition for a writ of habeas corpus." *Joseph v. Coyle*, 469 F.3d 441, 449 (6th Cir.2006). Mr. Coles' case is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 because he brought this case after 1996. *Pinchon v. Myers*, 615 F.3d 631, 638 (6th Cir.2010); and *Hardy v. Beightler*, 11-3773, 2013 WL 4268350 (6th Cir. Aug. 16, 2013).

With respect to claims adjudicated on the merits, this Court applies a deferential standard of review. If a state court considered a claim on the merits, a writ of habeas corpus may be granted if "the state court's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Joseph*, 469 F.3d at 449 (quoting 28 U.S.C. § 2254(d)(1)).

Clearly established federal law is based on the holdings of the United States Supreme Court; however, an explicit statement by the Court is not mandatory. "[T]he legal principles and standards flowing from [Supreme Court] precedent" also qualify as "clearly established law." *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir.2005) (quoting *Taylor v. Withrow*, 288 F.3d 846, 852 (6th Cir.2002)).

22

On habeas review, claims of prosecutorial misconduct are reviewed deferentially. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). To be cognizable, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (citation omitted). Where a prosecutor's conduct was improper and so flagrant that it compromised the trial's fairness, then the writ should issue.

# ARGUMENT

I.  **When the State's charging instrument alleges numerous identical offenses occurring over an extended period of time it violates the accused's right to notice, due process and a fair trial while failing to protect against double jeopardy.**

## Notice is a Pretrial Concern

Due process requires the prosecution to provide notice of the specific charge, and a chance to be heard in a trial on the issues raised by that charge. *Cole v. Arkansas*, 333 U.S. 196, 201 (1948); accord, *United States v. Simmons*, 96 U.S. 360, 362 (1877)(Criminal defendants must be apprised, with reasonable certainty, of what they are accused.).  Notice principles are intended to address the accused's need to know before trial what the prosecution intends to prove, so that he can cogently prepare to meet the prosecution's case or enter a guilty plea. *Hughes v. Carlton*, 2005 WL 3338726, Case No. 3:05–0120, *3 (M.D.Tenn. Dec. 8, 2005) (citing *United States v. Odom*, 252 F.3d 1289, 1298 (11th Cir.2001).

The district court's observations to the contrary, notice is not provided if the accused doesn't find out what the charges against him are until after the prosecution rests its case-in-chief.  The state court's decision allowing for notice post-trial is unreasonable, illogical, and unfair.  A single

count alleging that the accused committed a generic act of sexual misconduct on a particular individual at some point within a particular time period might not present a notice problem standing alone. But hundreds of counts alleging the same misconduct repeatedly over the same period of time with nothing to distinguish one act from another, are another matter entirely.

A defendant may have an alibi, for example. Charging instruments like this one, however, foreclose such defenses. This is because, unless the defendant maintains an alibi for the entire timeframe alleged, the indictment's vagueness always gives the prosecution room to argue around it. This case illustrates the problem pristinely. The indictment originally charged Mr. Coles with repeatedly sexually abusing S.D. during two three-year periods before and after she turned 13. It is clear from the evidence, however, that Mr. Coles did not reside with S.D. and her family for long stretches during those two time frames.

After S.D. testified the State amended the indictment – to reflect abuse twice in 1998 and then over a four month period in 2000. Had Mr. Coles prepared an alibi defense prior to trial that fell outside of those amended parameters (as he clearly could have), that alibi would be

nullified.  Faced with this reality, the fact that this or any other defendant opts for a different approach to his defense where he proceeds to trial blind to the actual allegations is hardly surprising.  Nor should it work against him when he argues that notice was improper.

Accordingly, when they are able prosecutors must inform criminal defendants about how each count in an indictment is different from another.  From the charging decision until it rests its case-in-chief, the state, alone, is in complete charge of the prosecution.  It is the state that institutes the case by securing the indictment, information, or complaint. The defense is not even permitted to be present at, let alone participate in, that process.  The state, not the defense, controls every aspect of the charging decision and the evidence underlying it. The accusations derive from state witnesses based on the state's evidence.  Simply put, the state owns the case.  The responsibility for assuring that the instrument charging that case does what it is supposed to, therefore, necessarily rests squarely with the state.

The district court acknowledged that notice was a right guaranteed by the Sixth and Fourteenth Amendments and that such a right was fundamental.  (R. 18, Page ID# 2246) Nevertheless, it also concluded that

the state court's decision that notice was sufficient here was not
unreasonable.  Specifically, the district court observed that the following
was enough:

> The state court explained that the indictment alleged a time period in
> which the criminal conduct occurred; the bill of particulars
> identified the victim and the places that the alleged criminal conduct
> occurred; and testimony *at trial* indicated at least 43 incidents of
> rape.

(R. 18, Page ID# 2246) (emphasis added).  Initially, however, that
observation includes a glaring inaccuracy.  The location of the alleged rapes
included in the bill of particulars was not accurate. The bill of particulars
claimed that all of the incidents alleged between January 8, 1998 and
January 7, 2001 occurred in Cleveland, Ohio.  It also provided that the
later incidents allegedly occurred in Cleveland and Parma, Ohio. (R. 13-1,
Page ID# 1968-2042) These were the only two locations provided pretrial.
Yet, according to S.D.'s testimony at trial, none of the incidents occurred
in Cleveland. Based on her account and everything the prosecution argued
at trial, the abuse occurred in Lakewood and Parma, Ohio.[2]

    Based on this information, therefore, when Mr. Coles went to trial
all he knew was that his stepdaughter, S.D., had accused him of repeated

---

[2] Also in Iowa, but that conduct was uncharged.

acts of sexual misconduct.  The location alleged was wrong. The specific

acts of sexual conduct were a mystery, and the many acts allegedly

occurred at some undesignated time/day/year within a six-year window.

This is not notice.

>    ### The prosecution's obligation to provide Notice is not fulfilled by witness speculation at trial.

According to the district court, the prosecution fulfilled the rest of

its obligation to provide notice during the trial. The only prosecution

witness to testify about this abuse was S.D. Other than the first incident,

which led to DCFS involvement and her mother's decision to, temporarily

at least, eject Coles from the family's home in Lakewood, S.D. provided

little in the way of specifics. After that first incident when S.D. was

allegedly 10-years-old, the abuse started up again the summer she was 12.

S.D. testified that their contact involved only vaginal intercourse.  Initially,

the conduct would occur weekly or once every couple of weeks.  (R. 7-23,

Page ID #1063-65)

During the next year, after S.D. turned 13 years-old, she recalled that

the family moved to another Lakewood residence.  S.D. claimed at this

point, she and Coles would have intercourse "a lot" *probably* twice a week.

(R. 7-23, Page ID #1072-75) In June of 2002, the family moved to Parma where she and Coles would have sex in different rooms throughout the house, "*almost* every day." (R. 7-23, Page ID # 1076-78) During another timeframe between March and July of 2004, her testimony was that Coles abused her twice a week. (R. 7-23, Page ID # 1086-91)

According to the district court, S.D.'s "approximations" at trial gave Coles notice of the 245 counts against him. But a witness' speculation about events does not constitute evidence. *Berry v. Palmer*, 518 F. App'x 336, 343, 2013 WL 1188985 (6th Cir. 2013) Witnesses are required to testify about what they saw and heard – what they actually experienced or witnessed – not what they think/believe/speculate might have happened. Estimations, approximations, guesses are not evidence, and the district court's reliance on them to provide something as fundamental as pretrial notice, makes no sense.

In this context, the district court also overlooked the state court's erroneous factual observations concerning the jury's verdict. Following deliberations, Mr. Coles' jury acquitted him on all counts alleging misconduct before S.D. turned 13, but found him guilty of all sexual conduct after that milestone. According to the state court, the jury reached

29

this conclusion because S.D. had been more specific about the later incidents, and had only "guessed at" how many times Coles had molested her in the early ones. *Ohio v. Coles*, 2008 Ohio 5129, 2008 WL 4436872, *7. That observation misstates S.D.'s testimony. In fact, S.D. only provided estimations, and only about what she claimed "typically" occurred. Only once – with respect to the initial 1998 incident – did she provide any specifics.

The state court's conclusions with respect to notice and the evidence allegedly underpinning it were predicated upon an inaccurate reading of the facts and an unreasonable construction of the applicable of the law. The district court's decision, agreeing with the state court, was not reasonable and should be reversed.

> If the District Court had properly decided this case in light of this Court's decision in Valentine, then Mr. Coles would have been entitled to relief.

In ruling against Mr. Coles, the district court refused to apply this Court's decision in *Valentine v. Konteh*, *supra*. *Valentine* involved a situation very similar to this one. Like Coles' case, the issue in *Valentine* concerned whether the indictment's clarity was impaired by the fact that it charged the defendant with multiple identical counts over a period of

time.[3]  This Court concluded that the multiple indistinguishable nature of counts not otherwise anchored to specific offenses compromised the defendant's ability to defend himself against the allegations.  *Id*. at 633.

In *Valentine*, the defendant was charged with and convicted of twenty counts of rape, "each identically worded so that there was no differentiation among the charges." *Valentine*, at 628. The bill of particulars "merely restated the allegations and identified the family home as the location of all forty offenses." *Id*.  Accordingly, and just like Mr. Coles, rather than identifying specific individual instances of misconduct, the indictment Mr. Valentine faced simply claimed a "generic pattern of abuse rather than forty separate abusive incidents." *Id* at 643.

Since the Ohio General Assembly had not created such an offense, this Court noted that the State could not properly convict Valentine of perpetrating a pattern of abuse, and vacated all but two of the charges. This Court also noted that it was "doubtful that the indictment ...sufficiently apprises the defendant of what he must be prepared to meet." *Id*. at 632.  More to the point, this Court observed that "when prosecutors

---

[3] If anything, Coles' case presents a worse scenario – having faced 245 counts of rape, GSI and Kidnapping over a six year timeframe. Valentine, on the other hand, was charged with 20 counts each of rape and felonious sexual penetration over a span of 10 months.

opt to use such carbon-copy indictments, the defendant has neither adequate notice to defend himself, nor sufficient protection from double jeopardy.  *Id.* at 636.

In deciding that Mr. Valentine was entitled the writ, this Court relied in large part on *Russell v. United States*, 369 U.S. 749 (1962) as the clearly established applicable constitutional law. In *Russell*, the high court held that a valid indictment must address the following criteria: (1) "whether it contains the elements of the offense intended to be charged," (2) whether it "it sufficiently apprises the defendant of what he must be prepared to meet," and (3), "in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction." *Id.* at 763-764.

It is true, as the district court observed, that in *Russell*, the high court addressed the sufficiency, and therefore the constitutionality, of a federal indictment. It is also true that there is no constitutional requirement that states charge by way of an indictment.  Acknowledging that truth, however, doesn't change the fact that, whatever charging instrument a state uses, it must comply with constitutional imperatives. Really, that truth lies at the core of this Court's decision in *Valentine*, and it hardly breaks new

32

ground.

As it was in *Valentine,* the question in Mr. Coles' case is whether the prosecutor's decision to charge so many indistinguishable counts rendered the charging instrument unfathomable, thereby compromising the defendant's ability to understand the charges and prepare to meet them. At its core this is a notice concern.  Whatever else drove this Court's decision in *Valentine*, notice – i.e. a concern that individuals charged with crimes must know at the outset the allegations they are facing – was the primary consideration.  Whether that information is imparted through an indictment or other charging instrument, isn't the point.  The point is that the constitution requires that such an instrument apprise the defendant of the what, where, when and who of their cases.

Finally, it is unsettling that the district court believed itself capable of rejecting a holding issued by a higher court. Certainly, absent *en banc* consideration, this Court must follow the precedent of prior panels within its own circuit. See, e.g., *United States v. Humphrey*, 287 F.3d 422, 452 (6th Cir. 2001); *FDIC v. Abraham*, 137 F.3d 264, 268-69 (5th Cir.1998); *United States v. Hogan*, 986 F.2d 1364, 1368 (11th Cir.1993); *In re Penn Central Transp. Co.*, 553 F.2d 12, 15 (3d Cir.1977); *Doe v. Charleston Area Med. Ctr.,*

33

529 F.2d 638, 642 (4th Cir.1975); *United States v. Olivares-Vega*, 495 F.2d 827, 829 (2d Cir.1974).

The district court's rejection of *Valentine's* reasoning appears to fly in the face of *stare decisis*. Such a rule may not be an inexorable command when a court considers its own precedents. Nevertheless, trial courts are obliged to follow precedent set by the Supreme Court and Courts of Appeals. *Hutto v. Davis*, 454 U.S. 370, 375 (1982) ("Unless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be"). See also, *Lambert v. Warden*, 2003 WL 22071466 (6th Cir. 2003)(admonished the district court for second-guessing a panel decision in the habeas corpus area).[4]

Going into trial, the defendant needs to know the charges he is facing. It makes good sense to require prosecutors to inform criminal defendants about how each count in an indictment is different from another before trial. Even if good sense didn't require it, fairness should.

---

[4] Accord, *State v. Storch*, 1993-Ohio-38, 66 Ohio St. 3d 280, 291 (1993) (Ohio Supreme Court acknowledging that "as a lesser appellate court for purposes of federal questions, we ignore the words of the United States Supreme Court at our peril just as the "lesser" courts of Ohio ignore our words at their peril as to questions of state law.")

The right to notice is fundamental, and it was not met in this case.  In fact, everything about it – from the voluminous, repetitive indictment – to the evidence at trial – which guessed at the frequency of the incidents and offered generalities about the incidents themselves and their location – conspired to obfuscate what may, or may not have happened.

II.    **The Prosecutor's improper closing arguments bolstering the complainant's account while unjustifiably impugning Coles violated his rights to Due Process and a Fair Trial.**

It is well established that a prosecuting attorney, as an agent of the State of Ohio, has a constitutional duty in a criminal trial to assure that the defendant receives a fair and impartial trial. *Mooney v. Holohan*, 294 U.S. 103 (1935).  Such a duty requires the prosecutor to adhere to accepted rules regarding his manner and methods in conducting a criminal trial. A prosecutor is at liberty to prosecute with earnestness and vigor, striking hard blows, but may not strike foul ones. *Berger v. United States*, 295 U.S. 78, 88 (1935).

During closing arguments then, a prosecutor must forego efforts to obtain a conviction by going beyond the evidence. Under the circumstances, while even a single improper comment may be sufficient to create a constitutional violation, the frequency and cumulative effect of

multiple improper comments, like those in this record, magnifies the prejudicial effect of the statements. *Yanai v. Girts*, 501 F.3d 743, 760 (6th Cir. 2008). It is not enough for the reviewing court to feel that the evidence is strong and that the defendant probably would have been convicted anyway. *Eberhardt v. Bordenkircher*, 605 F.2d 275, 279 (6th Cir. 1979). That is a decision for the jury to make, unaffected by improper argument or impermissible inferences urged by the prosecutor. *Id.*

In the case at bar, the assistant county prosecutor trying Mr. Coles's case committed several acts of misconduct during its summation to the jury in this highly emotional and troubling case.

The prosecutor repeatedly vouched for S.D.'s credibility.

The purpose of the prosecution's closing argument is to assist the jury in analyzing and evaluating the evidence by offering the prosecutor's overview of the evidence. *Bates v. Bell*, 402 F.3d 635 (2009) The prosecutor oversteps this limitation by giving his personal opinion about the defendant's guilt or a witnesses' veracity. *Maurer v. Minnesota Dept. of Corrections*, 32 F.3d 1286, 1290-1291 (8th Cir. 1994) (Prosecution's vouching testimony in rape case violated due process.)

In the case at bar, the prosecutor initiated his closing remarks to the jury with the following comment, "I can't imagine a victim or witness in any case that would be more credible or believable than [S. D.] was in this case." (R. 7-26, Page ID #1709-1711) The defense objected, the court sustained the objection, and instructed the jury generally that when it sustains objections, it should disregard the comments because they are not evidence.  (R. 7-26, Page ID #1712)

Notwithstanding the fact that the court sustained the objection to the remarks on S.D.'s credibility, the prosecutor returned to the subject repeatedly saying –

> "Now, I hope you remember that during our voir dire process we talked about how different people react to different sorts of stress and situations...Maybe you all look at [S.D.] and say I wouldn't have done it that way...maybe someone would think [she] handled it the wrong way. But it doesn't change her credibility and whether or not she was believable. And I submit to you, she was believable."

(R. 7-26, Page ID #1726-1727)

> "And I am telling you, what she told you isn't over a cell phone. And it is not over an attempt to be with her friends. She is telling you what happened because it happened, and she doesn't want this guy to get away with it."

(R. 7-26, Page ID #1735)

"Now, there is all the other issues, but I was looking at who's the most credible person here. Sara did not waiver from what she said before. She told the truth. You could see the demeanor."

(R. 7-26, Page ID #1771)

Later the prosecutor said "[S.D.] did not waiver from what she said before. She told the truth."

The case at bar hinged entirely on S.D.'s credibility. If the jury did not believe that she was testifying truthfully, and there were good reasons to disbelieve her account, it would not have convicted Mr. Coles. Her testimony provided the sole evidence that any of the alleged sexual abuse occurred. Because S.D.'s credibility was the main issue before the jury, the prosecutors' improper vouching for her credibility biased the jury and prejudiced Mr. Coles.

In affirming, the Eighth District reached the incredible conclusion that "Even though the prosecutor improperly expressed his personal opinion during closing argument, he was arguably commenting on what the evidence showed. The prosecutor was not averring to his personal knowledge, but he was using the statements to enforce what the evidence and testimony revealed." *Coles* at ¶66. Statements such as "I can't imagine a victim or witness in any case that would be more credible or believable

than S.D. was in this case," or "She told the truth," are not general comments on what the evidence showed. They are direct statements of the prosecutor's belief that the complaining witness told the truth.

The state court's finding that such remarks were neither improper nor harmful was just not reasonable. The district court's similar conclusions should be reversed. This Court addressed similar remarks in *United States v. Carroll*, 26 F.3d 1380, 1383 (6th Cir. 1994). There, this Court concluded that when the prosecutor vouches for the credibility of the Government's witnesses, he unfairly vests that witness with the prestige of the Government. The prosecution did the same thing in Coles' case.

<u>The Prosecutor inappropriately attacked Mr. Coles' character.</u>

The State of Ohio also improperly attacked Coles' his character by inadmissible, irrelevant and unfairly prejudicial evidence – then replayed it for the jury during closing argument. Specifically, the state argued that Mr. Coles was, "an abuser. He does his whoopings. He beats Dawn. Complete disregard for anybody but himself. He gets his gratification off of beating people and off of raping S.D." (R. 7-26, Page ID #1777)

Next the prosecutor opined,

39

> "Use your common sense. You know that. This is a long, drawn out period of time that finally she just can't deal with anymore. Now, that's what I perceived...I used my common sense and I looked at these witnesses as what they are, and that's what I was able to come up with...I ask that you go back to the jury room, use the common sense and look at the biases of these witnesses, and look at how truthful they were...and find a guilty verdict on all counts."

While the prosecutor did not explicitly say here - "I think Coles is guilty," he sets up a logical syllogism, which reaches the same conclusion.

The state implored the jury to convict Mr. Coles not because of what he allegedly did but because of what he allegedly was; an abuser. The state told the jury it should convict the jury because Mr. Coles had an abusive personality, who acted in conformity with the personality by abusing S.D. In highly charges cases like one, this Court has frowned upon such comments, remarking that,

> Cases involving sexual abuse exert an almost irresistible pressure on the emotions of the bench and bar alike. Because such cases typically turn on the relative credibilities of the defendant and the prosecuting witness, however, a strict adherence to the rules of evidence and appropriate prosecutorial conduct is required to ensure a fair trial.

*Martin v. Parker*, 11 F.3d 613, 616-17 (6th Cir. 1993). Similarly, in

*Washington v. Hofbauer*, 228 F.3d 689, 699-700 (6th Cir. 2000). This Court further explained:

[T]he prosecutor's animated recitation of this character evidence during closing arguments was plainly improper. In his initial summation, the prosecutor improperly implied that the jurors should consider Washington's unseemly character when rendering their verdict; in his rebuttal, he explicitly urged them to do so. Meanwhile, he attacked Washington as a "self-serving, illogical selfish non-compassionate, no emotional interest in a family type of person" who acted irrational due to "drugs and alcoholism and a general not caring about other people." J.A. at 270-71. The crime, he implored to the jury, "[s]ure fits him."J.A. at 271. The prosecutor thus articulated perhaps the paradigm of the improper "bad character" argument-that the alleged criminal acts "fit" the evidence of Washington's character and lifestyle.

This Court concluded that such a character attack was pervasive, highly improper and warranted relief. The attack against Coles was no less severe. The prosecutor's improper comments about Mr. Coles' character exacerbated the case's tumult. Juxtaposed against the arguments underscoring S.D.'s credibility, the prosecutor invited the jury to convict Coles. Other than final instructions, this was the last information the jury received before retiring to deliberate in this difficult case and it was intended to impact those deliberations.

## CONCLUSION

Based on the foregoing, Appellant Joseph Coles asks this Court to reverse the District Court, grant his Petition for Writ of Habeas Corpus and discharge him from custody, grant him a new trial, or remand the matter for resentencing.

Respectfully submitted,

/s/Erika B. Cunliffe
Erika B. Cunliffe (OH #0074480)
Assistant Public Defender
Cuyahoga County
310 Lakeside Avenue, Suite 200
Cleveland, Ohio 44113
(216) 443-8353
Peachliffe1@yahoo.com

Counsel for Appellant

## CERTIFICATE OF SERVICE

A copy of this document was filed electronically with the U.S. Court of Appeals for the Sixth Circuit this 1st day of September, 2013. Service will be undertaken through the Court's electronic filing system.

/s/ Erika B. Cunliffe
Erika B. Cunliffe

Attorney for Appellant

## CERTIFICATE OF COMPLIANCE WITH SIXTH CIRCUIT RULE 22(c)(8)

Appellant, Joseph Coles, hereby certifies that the word count in the foregoing brief as counted by Microsoft Word, the word processing software used to prepare the brief, is 9251.

/s/Erika B. Cunliffe
Erika B. Cunliffe
Ohio Bar No. 0074480
Counsel for Appellant

# DESIGNATION OF RELEVANT DOCUMENTS

Appellant, pursuant to 6th Circuit Rule 30(g), hereby designates the following filings in the District Court as relevant documents -

| Description of Item | Record No. | Page ID # |
| --- | --- | --- |
| Petition under 28 U.S.C. 2254 | 1 | 1 |
| Return of Writ | 7 | |
|   Indictment | | |
|   Ex. 1a | 7-18 | 307 |
|   Ex. 1b | 7-19 | 436 |
| Transcripts | | |
|   Miscellaneous Hearing | 7-22 | 796 |
|   Volume I | 7-23 | 829 |
|   Volume II | 7-24 | 1101 |
|   Volume III | 7-25 | 1361 |
|   Volume IV | 7-26 | 1665 |
| Traverse | 12 | 1934 |
| Magistrate Judge's R & R | 14 | 2043 |
| Objections to R& R | 16 | 2094 |
| Order | 18 | 2235 |
| Notice of Appeal | 20 | 2259 |